**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KUNAL SETHI,

               Petitioner,

v.

MOHAMMED JAFFAR ISMAIL and
LUBNA ISMAIL,

               Respondents.

Case No. 2:25-cv-13448 (BRM) (AME)

**OPINION**

MARTINOTTI, DISTRICT JUDGE

      Before this Court is Petitioner Kunal Sethi's ("Petitioner") Motion to Confirm the arbitration award issued by the American Arbitration Association ("AAA") in *Sethi v. Ismail*, AAA Case No. 01-24-0000-6077, on April 22, 2025 (the "Award") (ECF No. 2); and Respondents Mohammed Jaffar Ismail and Lubna Ismail's ("Respondents") Cross-Motion to Vacate the Award (ECF No. 4) pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*. Petitioner filed an Opposition on August 4, 2025 (ECF Nos. 6, 7, 8); and Respondents filed a Reply on August 11, 2025 (ECF No. 9). This Court has jurisdiction pursuant to 42 U.S.C. § 1332(a).[1] Having reviewed and considered the submissions filed in connection with the motions and having declined to hold oral argument in accordance with Local Civil Rule 78.1(b), for the reasons set forth below

---

[1] "The FAA does not independently create federal question jurisdiction . . . ." *France v. Bernstein*, 43 F.4th 367, 377 n.7 (3d Cir. 2022) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)). Therefore, to confirm, vacate, modify an arbitration award under the act requires diversity jurisdiction pursuant to 28 U.S.C. § 1332, which is to be determined based on the petition submitted to the court and not the underlying controversy between the parties. *Id.* (citing *Badgerow v. Walters*, 596 U.S. 1, 4 (2022)).

and for good cause shown, Petitioner's Motion to Confirm is **DENIED**, Respondents' Motion to Vacate is **GRANTED**, and the matter is **REMANDED** to the AAA for additional arbitration proceedings and further evaluation consistent with this Opinion.

I.    BACKGROUND

A.    **Factual Background**

In 2018, Respondents owned and operated a single restaurant business titled Tribos Peri Peri ("TPP") in Saddle Brook, New Jersey. (ECF No. 1-5 ¶ 33.) On August 1, 2019, Respondents entered into a General Partnership Agreement (the "Operating Agreement") with Petitioner and non-party Nitesh Dabholkar ("Dabholkar") to form an LLC—TPP Express, LLC (the "Franchise Company")—to market and establish TPP franchises, which would be organized and governed under the laws of New Jersey. (ECF No. 1-1 §§ III, XI(1).) Pursuant to Section III of the Operating Agreement, Petitioner and Dabholkar each were provided with a 20% ownership interest in the franchise. (*Id.* § III, VI(5).) This interest would last indefinitely *if* twenty franchise stores were established "within thirty six months from the date of the formation of the Franchise Company." (ECF No. 1-5 § V(A); *see also id.* § VI(2) (providing Respondents "exclusively will own the rights to the brands, trademarks, logos and other intellectual property for [TPP] until twenty franchise stores are established and operating").) However, if the members failed to establish the twenty franchise stores within the allotted time, the Operating Agreement would terminate, and ownership would revert back to Respondents solely. (ECF No. 1-5 § V(B).) Pursuant to Section V, in the event the Operating Agreement was terminated and ownership reverted, Petitioner and Dabholkar each would be entitled to a 20% interest in "the royalites of any franchise stores *they have established* during the thirty six month period." (*Id.* (emphasis added).)

2

On November 6, 2020, Petitioner, Respondents, and Dabholkar entered into an addendum to the Operating Agreement (the "Addendum"). (*See generally* ECF No. 1-2.) The addendum contained three relevant provisions, it: (1) removed Dabholkar as a member of the Franchise Company; (2) amended Section III to provide Petitioner with a 40% interest in the franchise; and (3) amended Section V to extend the time to establish the twenty franchise stores from thirty-sixth months to fifty-four months from the date of the formation—January 31, 2024. (*Id.* ¶¶ 3–5.) The addendum, however, also amended Section V to remove the terms "they have" from the provision. (*Compare* ECF No. 1-1 § V(B), *with* ECF No. 1-2 ¶ 5.) Therefore, pursuant to the amended Section V, in the event the Operating Agreement was terminated and ownership reverted, Petitioner would be entitled to a *40%* interest in "the royalties of any franchise stores *established* during the fifty-four month period." (ECF No. 1-2 ¶ 5 (emphasis added).)

Prior to February 1, 2024, six franchise stores were successfully established. (ECF No. 1-5 ¶ 161; *see also id.* ¶ 162 (declining to consider as established four additional franchise stores).) In 2023, an additional restaurant was initially established in Artesia, California (the "Artesia TPP"). (*See id.* ¶ 41.) At the time the Artesia TPP was opened, the Franchise Company was not authorized to establish franchises in California. (*Id.*) On March 4, 2023, a franchise agreement was entered pertaining to the Artesia TPP. (*See id.*) However, the Artesia TPP was closed nineteen days later on March 23, 2023. (*See id.* ¶ 42.)

On February 1, 2024, the Operating Agreement terminated and ownership reverted back to Respondents. (*Id.* ¶ 44.)

### B.    Arbitration History

On February 9, 2024, Petitioner filed a demand for arbitration pursuant to Section XI(2) of

the Operating Agreement. (*See generally* ECF No. 1-3.) Section XI(2) provides, in relevant part,

> the [p]arties agree that any dispute, claim, or controversy arising out
> of or relating to [the Operating Agreement] will be resolved through
> mandatory binding arbitration administered by the [AAA] in
> accordance with its Commercial Arbitration Rules, and the
> judgment of its arbitrator(s) may be entered by any court of
> competent jurisdiction. The [p]arties further agree that the [FAA]
> governs the interpretation and enforcement of this provision.

(ECF No. 1-1 § XI(2).) The demand for arbitration included six causes of action: (1) breach of

contract (ECF No. 1-3 ¶¶ 49–57); (2) breach of fiduciary duties (*id.* ¶¶ 58–62); (3) breach of the

covenant of good faith and fair dealings (*id.* ¶¶ 63–69); (4) unjust enrichment (*id.* ¶¶ 70–74); (5)

accounting (*id.* ¶¶ 75–78); and (6) oppression and freezeout of a minority shareholder (*id.* ¶¶ 79–

84). The demand for arbitration sought damages totaling $1,200,000.00 as well as attorneys' fees

and costs. (*Id.* ¶ 1.)

On March 8, 2024, Respondents filed an answer and counterclaims. (*See generally* ECF

No. 1-4.) Relevant to this matter, the counterclaims included a claim for reputational damage and

lost revenue based on Petitioner's closing of the Artesia TPP without Respondents' notification or

consent totaling $75,966.36.[2] (*See id.*, Counterclaim ¶ 36, Request for Relief ¶ (c).) The

counterclaims also sought attorneys' fees and costs. (*Id.*, Request for Relief ¶ (d).)

On March 27, 2024, an arbitrator was appointed (the "Arbitrator"). (ECF No. 1-5 ¶ 14.)

Between February 10 and March 14, 2025, the Arbitrator conducted the hearing, during which the

parties had the opportunity to submit supplemental briefs on specific legal questions. (*Id.* at 1;

---

[2] Respondents' counterclaims included requests for reputational damage totaling $75,000 and
unauthorized purchases totaling $966.36. (ECF No. 1-4, Counterclaim ¶ 36–37.)

*accord id.* ¶¶ 15–31.) On April 1, 2025, the parties confirmed there were no further proofs to offer, and the Arbitrator closed the hearing as he was satisfied the record was complete. (*Id.* ¶ 32.)

On April 22, 2025, the Arbitrator issued the Award, which affirmed Petitioner's breach of contract claim (*see generally id.* ¶¶ 57–107) and rejected his remaining claims, *i.e.*, breach of fiduciary duties; breach of covenant of good faith and fair dealings; unjust enrichment; accounting; and oppression and freezeout of a minority shareholder (*see id.* ¶¶ 108–44). Notably, the Arbitrator did not find Respondents breached the Operating Agreement prior to the termination of the agreement on January 31, 2024. (*See generally id.* ¶¶ 57–107). Rather, the Arbitrator found Respondents breached the Operating Agreement by failing to pay Petitioner his 40% interest in royalties on January 31, 2024. (*See generally id.*; *see also id.* ¶ 145 ("[Petitioner]'s main claim accrued on February 1, 2024 when royalites first became due under the [Operating Agreement] as the arbitrator interprets it . . . ."); ECF No. 1-6 ¶ 9 (determining "Respondents' failure to make any royalty payments post-termination to be the breach"); *but see* ECF No. 1-1 § VIII(1) (requiring profits to be distributed to the members within ten business days of the last day of January).) "In summary, the [A]rbitrator interpret[ed] both the [Operating Agreement] and the [A]ddendum to entitle [Petitioner] to royalties received from franchise stores opened and operational as of January 31 , 2024" (ECF No. 1-5 ¶ 106), which the Arbitrator held to be a "total" breach of the Operating Agreement entitling Petitioner to a lump sum payment of the estimated future royalties (*see id.* ¶ 107 ("The [A]rbitrator concludes that the Respondents' failure to make any royalty payment to [Petitioner] is a breach of the [Operating Agreement] and [A]ddendum and entitles [Petitioner], now, to a fair estimate of his share of future royalties.")).

Furthermore, the Arbitrator rejected Respondents' defenses and counterclaims, including the claim for reputational damage. (*See generally id.* ¶¶ 145–55.) Specifically, the Arbitrator found:

> Respondents have not proven any damage as a result of closure of the Artesia [TPP]. Their suggestion of potential reputational damage is purely speculative. They did not present proof that any prospective franchisee refused to sign a franchise agreement because of concern about closure of the Artesia [TPP]. The claim that Respondents are entitled to damages by reason of that closure is specious.

(*Id.* ¶ 152.) However, the Arbitrator also found that, because "the [F]ranchise [C]ompany was not authorized under California law to make franchise sales until May 2023, months after the Artesia franchise agreement was signed[,] . . . . the Artesia franchise agreement is unenforceable." (*Id.* ¶ 153.)

Reviewing the record, the Arbitrator determined only six franchise stores were established by January 31, 2024. (*Id.* ¶ 161; *see also id.* ¶ 162 (declining to consider as established four additional franchise stores).) Based on a damage calculation spreadsheet prepared by Petitioner's expert, the Arbitrator calculated the total for past and future royalites to be $640,280.33. (*Id.* ¶ 165.) Furthermore, the Arbitrator awarded attorneys' fees and costs totaling $116,434.50 under AAA Rule R-49(d)(ii) (*id.* ¶¶ 175–76), which provides an arbitrator's award may include "attorneys' fees if all parties have requested such an award" (*id.* ¶ 169).

On April 25, 2025, Respondents filed a request for reconsideration under AAA Rule 52(a), which permits an arbitrator to interpret an award or to correct typographical errors. (ECF No. 1-6 at 1–2.) Specifically, Respondents requested the Arbitrator to: (a) remove Respondents from the Award and substitute the Franchise Company in their place; (b) reduce the damages based on a calculation error; (c) vacate the award of attorneys' fees and costs; and (d) eliminate the conclusion

the Franchise Company was not authorized under California law to enter into the Artesia franchise agreement. (*Id.* at 2.) In response, Petitioner filed an opposition to the request on May 16, 2025. (*Id.*) On May 20, 2025, both Respondents and Petitioner filed supplemental submissions. (*Id.*) On May 22, 2025, the Arbitrator rejected the request for reconsideration as the requests were "not matters that can be the subject of [AAA Rule 52(a)]." (*Id.* ¶ 27.)

### C.    Procedural History

On July 17, 2025, Petitioner filed a Petition and Motion to Confirm the Award pursuant to 9 U.S.C. § 9. (ECF Nos. 1-2.) On July 19, 2025, Respondents filed a Cross-Motion to Vacate the Award pursuant to 9 U.S.C. § 10. (ECF No. 4.) In support of their Cross-Motion, Respondents argue the Award demonstrates evident partiality in concluding the Artesia franchise agreement was unenforceable (*see generally id.* ¶¶ 60–69) and the Arbitrator exceeded his powers by awarding premature and speculative damages in response to Petitioner's breach of contract claim (*id.* ¶¶ 47–59); imposing personal liability against Respondents (*id.* ¶¶ 20–46); and awarding attorneys' fees and costs (*id.* ¶¶ 70–81). On August 4, 2025, Petitioner filed an Opposition to Respondents' Cross-Motion to Vacate. (ECF Nos. 6, 7, 8.) In response, Respondents filed a Reply on August 11, 2025. (ECF No. 9.)

## II.    LEGAL STANDARD

The FAA supplies parties to an arbitration agreement with the authority to apply to the court for an order confirming, 9 U.S.C. § 9, vacating, *id.* § 10, or modifying an arbitration award, *id.* § 11. "[M]indful of the strong federal policy in favor of commercial arbitration," *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012) *as amended* (Apr. 4, 2012), however, "the court[] play[s] only a limited role when asked to review the decision of an arbitrator." *Wilkes Barre Hosp. Co. v. Wyo. Valley Nurses Ass'n PASNAP*, 453 F. App'x 258, 260 (3d Cir. 2011)

(quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987)). The court reviews an award under an "'extremely deferential standard,' the application of which 'is generally to affirm easily the arbitration award.'" *Hamilton Park Health Care Ctr. Ltd. v. 1199 SEIU United Healthcare Workers E.*, 817 F.3d 857, 861 (3d Cir. 2016) (quoting *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003)); *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005), *as amended* (Mar. 17, 2005) ("There is a strong presumption under the [FAA] in favor of enforcing arbitration awards." (internal citation omitted)).

"[E]ffusively deferential language notwithstanding, the courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators," *Hamilton Park Health Care Ctr.*, 817 F.3d at 861 (quoting *Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir. 1996)), and may vacate or modify an award "under exceedingly narrow circumstances," *Dluhos*, 321 F.3d at 370. Pursuant to Section 10(a) of the FAA, the court may vacate an arbitration award if: "(1) [the award] was procured by corruption, fraud, or undue means; (2) the arbitrator[] demonstrated partiality or corruption; (3) [the arbitrator] w[as] guilty of misconduct; or (4) [the arbitrator] exceeded [his or her] powers." *Anoruo v. Tenet HealthSystem Hahnemann*, 697 F. App'x 110, 111 (3d Cir. 2017) (citing 9 U.S.C. § 10(a)).

Similarly, pursuant to Section 11 of the FAA, the court may only modify an award if: (a) there was "an evident material mistake in the description of any person, thing, or property referred to in the award"; (b) "the arbitrators have awarded upon a matter not submitted to them"; or (c) "the award is imperfect in matter of form not affecting the merits of the controversy." "If one of these latter three events has occurred, the [c]ourt may modify and correct the award so as to effectuate its intent and promote justice between the parties." *AV Design Servs., LLC v. Durant*,

Civ. A. No. 19-8688, 2024 WL 378612, at *2 (D.N.J. Jan. 31, 2024). The moving party "bears the burden of proving that the arbitration award at issue should be vacated [or modified]." *Jersey Shore Univ. Med. Ctr. v. Local 5058, Health Prof'ls & Allied Emps.*, Civ. A. No. 16-4840, 2017 WL 1025180, at *3 (D.N.J. Mar. 16, 2017) (citation omitted); *see also Handley v. Chase Bank USA NA*, 387 F. App'x 166, 168 (3d Cir. 2010) ("The party seeking to overturn an award bears a heavy burden, as these are "exceedingly narrow circumstances . . . .'" (quoting *Dluhos*, 321 F.3d at 370)).

## III.   DECISION

Petitioner moves for an order confirming the Award pursuant to 9 U.S.C. § 9 (*see generally* ECF No. 2); and Respondents cross-move for an order vacating the same award pursuant to 9 U.S.C. § 10(a)(2) and (4)[3] (*see generally* ECF No. 4). As noted above, the Arbitrator rejected all causes of action against Respondents but the common-law breach of contract claim. (*See generally* ECF No. 1-5 ¶¶ 57–144.) Furthermore, the Arbitrator found Respondents sole breach of the Operating Agreement was their failure to pay Petitioner his 40% interest in royalties for the six

---

[3] Although Respondents also claim the Award should be vacated for misconduct pursuant to Section 10(a)(3) (*see* ECF No. 4-1 ¶ 19), Respondents fail to brief this issue (*see generally* ECF No. 4). Therefore, the Court need not address it. *See Miller v. Burt*, 765 F. App'x 834, 838 (3d Cir. 2019) ("[A] passing reference to an issue . . . will not suffice to bring that issue before this court." (quoting *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)).

Alternatively, Respondents claim the Award should be vacated under the New Jersey Uniform Arbitration Act ("NJUAA"), N.J. Stat. Ann § 2A:23B-1, et seq. (*See* ECF No. 4-1 ¶ 19.) "It is well established that absent clear intent to apply a non-FAA standard [for vacating an award], the FAA standard is to be applied." *CD & L Realty LLC v. Owens Ill, Inc.*, 535 F. App'x 201, 204 (3d Cir. 2013) (citing *Ario v. Underwriting Members of Syndicate 53 at Llyods*, 618 F. 3d 277, 295 (3d Cir. 2010)). Here, Section XI(2) provides the parties "agree that the [FAA] governs the interpretation and enforcement of this provision." (ECF No. 1-1 § XI(2).) The Operating Agreement is absent any suggestion the parties intended to apply the NJUAA, or any other non-FAA standard, in the interpretation or enforcement of the Operating Agreement. (*See generally* ECF No. 1-1.) Regardless, "there is no relevant distinction between the FAA and NJUAA vacatur standards that would change the outcome." *United Merch. Wholesale Inc. v. Direct Containers Inc.*, Civ. A. No. 18-617, 2018 WL 3601232, at *1–2 (D.N.J. July 26, 2018).

franchise stores established as of January 31, 2024, which the Arbitrator concluded to be a "total" breach entitling Petitioner to a lump sum payment of the estimated future royalties. (*See id.* ¶¶ 107–08.) Therefore, the sole cause of action at issue is based on the terms of the Operating Agreement, which contains a choice-of-law provision providing the agreement "will be governed by the laws of the State of New Jersey exclusively." (ECF No. 1-1 § XI, ¶ 1.)

"The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005); *see also Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996) ("Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."); *Homa v. Am. Express Co.*, 558 F. 3d 225, 227 (3d Cir. 2009) ("In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state.").

Here, the jurisdiction over requests to confirm, vacate, or modify an arbitration award is based on diversity jurisdiction. *See France v. Bernstein*, 43 F.4th 367, 377 n.7 (3d Cir. 2022). Therefore, the Court applies New Jersey choice of law rules in deciding whether the Operating Agreement's choice of law clause is enforceable. Pursuant to New Jersey law, "effect [is generally given] to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 331 n.21 (3d Cir. 2001) (citing *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992)). As the parties do not dispute the breach of contract claim is based on New Jersey common law precedents (*see* ECF No. 4-1 ¶ 55; *see also generally* ECF No. 6), the Court declines to consider whether the choice-of-law provision conflicts with New Jersey public policy. *See*

*Schaffner v. Monsanto Corp.*, 113 F.4th 364, 377 n.6 (3d Cir. 2024). Therefore, the Court will enforce the choice-of-law clause and apply New Jersey common law contract principles to the interpretation and enforcement of the Operating Agreement.

### A.    9 U.S.C. § 10(a)(2)

Pursuant to Section 10(a)(2), the court may vacate an arbitration award if the arbitrator demonstrated evident partiality or corruption. *Facta Health Inc. v. Pharmadent LLC*, Civ. A. No. 23-2224, 2024 WL 4345299, at *7 (3d Cir. Sept. 30, 2024) (citing 9 U.S.C. § 10(a)(2)). "[E]vident partiality is strong language and requires proof of circumstances *powerfully* suggestive of bias." *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 252 (3d Cir. 2013) (emphasis added) (quoting *Kaplan v. First Options of Chi., Inc.*, 19 F.3d 1503, 1523 n.30 (3d Cir. 1994)). "For an arbitrator's bias to be 'evident,' it 'must be sufficiently obvious that a reasonable person would easily recognize it.'" *Facta Health Inc.*, 2024 WL 4345299, at *7 (quoting *Freeman*, 709 F.3d at 253).

Here, Respondents argue the Award demonstrates evident partiality as the Arbitrator concluded the Artesia franchise agreement was unenforceable because the agreement was entered before the Franchise Company was authorized to do so under California law. (*See generally* ECF No. 4 ¶¶ 60–69; ECF No. 1-5 ¶¶ 153–54.) However, this issue was "never raised by the parties" (ECF No. 4 ¶ 67) and, as such, the Arbitrator's decision to address it "implicates fundamental due process concerns[] as Respondents had no notice that their execution of the Artesia [franchise] agreement would become a basis for liability." (*Id.* ¶ 68.) In response, Petitioner claims the issue

is not material as the Arbitrator determined "Respondents had not proven any damage as a result of the closure of the Artesia [TPP]."[4] (ECF No. 1-5 ¶ 152; *see* ECF No. 6 at 17.)

Reviewing the record, neither Petitioner nor Respondents alleged a cause of action based on the terms of the Artesia franchise agreement. (*See generally* ECF No. 1-3; *see also* ECF No. 1-4 ¶ 36; *accord* ECF No. 1-5 ¶ 56.) However, Respondents submitted a copy of the Artesia franchise agreement to the Arbitrator for review (*see* ECF No. 1-5 ¶¶ 150–54), which the Arbitrator reviewed in response to Respondents' counterclaim for reputational damage and lost revenue relating to the Artesia TPP (*id.* ¶¶ 145–55 (reviewing Respondents' "Defenses and Counterclaim(s)")).

The Arbitrator determined Petitioner was not liable for reputational damage and lost revenue under the terms of the General Partnership Agreement and that Respondents' allegation of potential reputational damage were purely speculative as Respondents "did not present proof that any prospective franchisee refused to sign a franchise agreement because of concern about closure of the Artesia [TPP]." (*Id.* ¶¶ 149, 152.) The Arbitrator also found the Artesia franchise agreement was unenforceable as a matter of law because the parties entered into the agreement before the Franchise Company was able to make such agreements under California Law. (*Id.* ¶¶ 153–54.) Therefore, the Arbitrator dismissed Respondents' counterclaim for reputational damage and lost revenue with prejudice. (*Id.* ¶ 155.) Notably, the Arbitrator did not impose liability against Respondents based on the determination the Artesia franchise agreement was unenforceable. (*Id.* ¶ 161 (imposing liability against Respondents based solely on the established franchises in Providence, Metuchen, Manalapan, Ellicott City, Westborough, and Sommerville).)

---

[4] Petitioner, however, fails to address whether the Arbitrator's consideration and determination of an issue never raised by the parties may sufficiently demonstrate the Arbitrator's evident partiality under Section 10(a)(2). (*See generally* ECF No. 6.)

Having opened the door by alleging a cause of action against Petitioner for damages based on the closing of the Artesia TPP, Respondents cannot claim the Arbitrator demonstrated evident partiality by reviewing *the entire submitted record* in deciding same. *See Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.*, 409 F.3d 574, 579 (3d Cir. 2005) ("[I]mprovident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award." (internal quotation marks omitted) (quoting *Major League Umpires Ass'n v. Am. League of Professional Baseball Clubs*, 357 F.3d 272, 279–80 (3d Cir. 2004)). At most, the Arbitrator's determination is a legal error potentially exceeding his powers under Section 10(a)(4). *See Facta Health Inc.*, 2024 WL 4345299, at \*7. As Respondents have not argued this issue, the Court need not decide whether the Arbitrator in determining the Artesia franchise agreement was unenforceable exceeded his powers under Section 10(a)(4). (*See* ECF No. 4 ¶¶ 60–69 (limiting the argument to Section 10(a)(2)).)

For the above stated reasons, Respondents' Cross-Motion to Vacate the Award under Section 10(a)(2) is **DENIED**.

### B.    9 U.S.C. § 10(a)(4)

Pursuant to Section 10(a)(4), the Court may vacate an arbitration award if the arbitrator exceeded its powers. "By contractually restricting the issues they will arbitrate, the individuals with whom they will arbitrate, and the arbitration procedures that will govern, parties to an arbitration agreement may place limits upon the arbitrator's powers that are enforceable by the courts." *Sutter*, 675 F.3d at 219–20. An arbitrator exceeds these limits, subjecting an award to judicial vacatur, by "decid[ing] an issue not submitted [for] [arbitration], grant[ing] relief in a form that cannot be rationally derived from the parties' agreement and submissions, or issu[ing] an award that is so completely irrational that it lacks support altogether." *Id.* In other words, when an

arbitrator "strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice, [the arbitrator] exceeds his [or her] powers and [the] award will be unenforceable." *Id.* (internal quotation marks omitted) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

An arbitrator exceeds its powers when either "the arbitrator demonstrates manifest disregard of the [law]," *Major League Umpires Ass'n*, 357 F.3d at 280, or the award violates established public policy as "ascertained by reference to the laws and legal precedents," *Easter Associated Coal Corp. v. United Mine Workers of America*, 531 U.S. 57, 62–63 (2000); *accord AV Design Servs.*, 2024 WL 378612, at *3. Whereas the "manifest disregard" doctrine requires the moving party to demonstrate the arbitrator "knew" and "appreciated" a governing legal principle but "nonetheless willfully flouted the governing law by refusing to apply it," *Paul Green Sch. Of Rock Music Franchising, LLC. v. Smith*, 389 F. App'x 172, 175–77 (3d Cir. 2010) (internal quotation marks omitted), the "public policy" doctrine merely requires the party to demonstrate the award violates a "well-defined" and "dominant" public policy as "ascertain[ed] by reference to the laws and legal precedents," *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993) (quoting *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983)); *accord Comcast of New Jersey, LLC v. IBEW Loc. Union No. 827*, Civ. A. No. 21-17050, 2022 WL 16895502, at *2–3 (D.N.J. Oct. 31, 2022), *aff'd*, Civ. A. No. 22-3239, 2024 WL 340692 (3d Cir. Jan. 30, 2024); *see also United Transp. Union Loc. 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 382 (3d Cir. 1995) ("The exception is available only when 'the arbitration decision and award create an explicit conflict with an explicit public policy . . . .'" (quoting *Serv. Emps. Int'l Union Local 36 v. City Cleaning Co.*, 982 F.2d 89, 92 (3d Cir. 1992))). "[T]he question of public policy is ultimately one for resolution by the courts." *W.R. Grace & Co.*, 461 U.S. at 766; *Stolt-Nielsen*,

559 U.S. at 671 ("[A]n arbitrator's task is to interpret and enforce a contract, not to make public policy.").

Here, Respondents argue the Arbitrator exceeded his powers by awarding premature and speculative damages in response to Petitioner's breach of contract claim (ECF No. 4 ¶¶ 47–59), imposing personal liability against Respondents (*id.* ¶¶ 20–46), and awarding attorneys' fees and costs (*id.* ¶¶ 70–81). Each of these arguments involves application of a comprehensive body of substantive state law, and the Court addresses each in turn.

### 1.    Breach of an Installment Contract

Pursuant to New Jersey law, a breach of contract claim requires a plaintiff to establish the following four elements: (1) "the parties entered into a contract containing certain terms"; (2) "[the] plaintiff did what the contract required [the plaintiff] to do"; (3) "[the] defendant did not do what the contract required [the defendant] to do, defined as a breach of the contract"; and (4) "[the] defendant's breach, or failure to do what the contract required, caused a loss to the plaintiff." *Woytas v. Greenwood Tree Experts, Inc.*, 206 A.3d 386, 392 (N.J. 2019) (alterations in original) (quoting *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016)). "Each element must be proven by a preponderance of the evidence." *Globe Motor Co.*, 139 A.3d at 64.

Although any breach of a contract may give rise to a claim for remedies, the courts distinguish between the remedies available for a "partial" breach—"[remedies] based on only part of the injured party's remaining rights to performance"—and a "total" breach—"[remedies] based on all of the injured party's remaining rights to performance."[5] *Restatement (Second) of Contracts*

---

[5] A breach of contract provides only three remedies: restitution—"return[ing] the innocent party to the condition he or she occupied *before* the contract was executed;" performance—"mak[ing] the non-breaching party whole by requiring the breaching party to *fulfill his or her obligation* under the agreement"; and compensatory damages—"put[ting] the innocent party into the position he or she *would have achieved* had the contract been completed." *Marina Dist. Dev. Co., LLC v. Ivey*,

§ 236 (1981); *see, e.g.*, *In re Est. of Balk*, 138 A.3d 572, 576 (N.J. Super. App. Div. 2016). For example, a "partial" breach of an installment contract by non-payment only entitles a plaintiff to seek recovery of the unpaid benefit; whereas a "total" breach entitles a plaintiff to "seek recovery of one lump sum representing the present value of the monetary benefits [the plaintiff] could have received over [the course of the contract]." *Cipala v. Lincoln Tech. Inst. (Cipala II)*, 843 A.2d 1069, 1072–73 (N.J. 2004) (quoting *Stopford v. Boonton Molding Co.*, 265 A.2d 657, 667 (N.J. 1970)); *see also Cipala v. Lincoln Tech. Inst. (Cipala I)*, 806 A.2d 820, 823 (N.J. Super. Ct. App. Div. 2002), *aff'd in part, rev'd in part*, 843 A.2d 1069 (stating a "partial" breach "gives rise to a claim for specific performance"); *see also Hage v. Unumprovident Corp.*, Civ. A. No. 04-5933, 2008 WL 5423954, at *11 (D.N.J. Dec. 29, 2008) ("Because of the 'absolute' or 'total' breach of the 'entire' contract, the plaintiff was able to . . . obtain his future benefits."). Therefore, when a plaintiff seeks remedies based on a total breach, the Court is required to conduct a two-step analysis by first determining whether the defendant breached the contract; and, if a breach occurred, then assessing whether said breach was in fact a "total" breach. *See, e.g.*, *Cipala II*, 843 A.3d 1069; *In re Est. of Balk*, 138 A.3d 572.

It is well-established that New Jersey, like other jurisdictions, follows the general rule "[a] breach of an installment contract by non-payment does not constitute a breach of the entire contract."[6] *Dean v. Provisor*, No. A-1199-20, 2022 WL 2711255, at *6 (N.J. Super. Ct. App. Div.

---

223 F. Supp. 3d 216, 221 (D.N.J. 2016) (emphasis added) (citing *Totaro, Duffy, Cannova and Company, L.L.C. v. Lane, Middleton & Company, L.L.C.*, 921 A.2d 1100, 1107 (N.J. 2007)). Although each of these remedies serves a different purpose, all three remedies serve the ultimate goal under contract law—"to put the injured party in as good a position as if performance had been rendered." *Id.*

[6] It is well-established a breach of an installment contract by non-payment may constitute a "total" breach permitting recovery of one lump sum of monetary benefits if the parties' agreement contains an acceleration clause. *See, e.g.*, *Dean v. Provisor,* No. A-1199-20, 2022 WL 2711255,

at *4–7 (N.J. Super. Ct. App. Div. July 13, 2022). Alternatively, the New Jersey Appellate Division has previously held non-payment may also constitute a "total" breach if accompanied by anticipatory repudiation. *See In re Est. of Balk*, 138 A.3d at 576 (citing, in part, *Restatement (Second) of Contracts* § 250). In an unpublished decision, however, the Appellate Division has more recently held non-payment does not constitute a "total" breach regardless of whether accompanied by anticipatory repudiation. *Dean*, 2022 WL 2711255, at *7 (citing *Restatement (Second) of Contracts* § 243(3)); *see also Kerrigan v. Otsuka Am. Pharm., Inc.*, 560 F. App'x 162, at *3 n.4 (3d Cir. 2014) ("While we are not bound by unpublished state court decisions, we may look to them as persuasive authority when ascertaining state law."). At this time, the New Jersey Supreme Court has not explicitly held whether a breach of an installment contract by non-payment may constitute a "total" breach permitting recovery of one lump sum of monetary benefits if accompanied by anticipatory repudiation. As the Arbitrator did not find Respondents alleged breach was accompanied by a repudiation (*see generally* ECF No. 1-5), however, this Court need not determine how the New Jersey Supreme Court would hold, if presented with the proper action.

Here, the Operating Agreement does not contain an acceleration clause. (*See generally* ECF No. 1-1.) As noted above, the Arbitrator did not find Respondents breach of contract was accompanied by an anticipatory repudiation. (*See generally* ECF No. 1-5.) In an email dated July 13, 2023, Respondents wrote: "we will owe you would be 40% of the royalty minus the expenses, for the remaining term of the 6 or 7 [f]ranchised stores." (ECF No. 1-5 ¶ 85.) And, on January 12, 2024, Respondents wrote:

> You will be eligible for 40% of the royalties collected ''*for any franchise stores they have established*'' per the contract.
>
> We differ in our interpretation of the language here.
>
>> • Per my interpretation Providence RI, Metuchen, NJ and Manalapan, NJ are eligible as these were signed up by Devin. The subsequent 4 were entirely fruits of my effort.
>>
>> • Per your interpretation, all seven should be included.
>
> Per the contract such disagreements may be decided by an Arbitrator only and their decision is binding on all.

(ECF No. 1-5 ¶ 86.) Neither of these emails suggest an anticipation to repudiate future payments. Rather, these emails merely suggest a disagreement as to the applicable number of franchise restaurants, which appears to this Court to have been a reasonable disagreement as neither Petitioner nor Respondents were ultimately correct in their interpretation. (*Compare* ECF No. 1-5 ¶ 86 (Petitioner arguing the applicable number to be seven), and *id.* (Respondents arguing the applicable number to be four), *with id.* ¶ 161 (Arbitrator finding the applicable number to be six).) Therefore, the Court finds neither exception applies to the installment contract rule and, as such, a

July 13, 2022) (quoting *In re Est. of Balk*, 138 A.3d at 576); *see also R.C. Beeson, Inc. v. Coca Cola Co.*, 337 F. App'x 241, 244 (3d Cir. 2009) ("[A] missed payment[] is insufficient to constitute a 'total breach' of the agreement . . . ."). Rather, "claims based on installment contracts or other divisible, installment-type payment requirements accrue with each subsequent installment" and "a plaintiff may sue for each breach *only* as it occurs." *In re Est. of Balk*, 138 A.3d at 576 (emphasis added) (quoting *Cnty. of Morris v. Fauver*, 707 A.3d 958, 971 (N.J. 1998)); *see also Berkley Risk Sols., LLC v. Indus. Re-Int'l, Inc.*, No. A-2366-15, 2017 WL 4159170, at *8 (N.J. Super. Ct. App. Div. Sept. 20, 2017) ("[A] cause of action accrues on the date upon which the right to institute and maintain a suit first arises." (internal quotation marks omitted)). "Courts have used the 'installment contract' approach in a variety of situations," *Metromedia Co. v. Hartz Mountain Assocs.*, 655 A.2d 1379, 1381 (N.J. 1995), including, but not limited to, claims for future profits and interests in royalites, *see, e.g.*, *R.C. Beeson*, 337 F. App'x at 243.

Here, the Operating Agreement is an installment contract which requires Respondents to pay Petitioner 40% of the royalties earned at the six franchise stores established prior to February 1, 2024. (*See* ECF No. 1-5 ¶¶ 106–07; *accord* ECF No. 1-1 § V(B)); *see also Dean*, 2022 WL 2711255, at *7 (applying the installment contract rule "where one party has fully performed his [or her] undertaking, and all that remains for the opposite party to do is to pay a certain sum of money at a certain time or times" (quoting *Phelps v. Herro*, 137 A.2d 159, 164 (Md. 1957)); *see also Restatement (Second) of Contracts* § 243(3) (applying the installment contract rule "[w]here at the time of the breach the only remaining duties of performance are those of the party in breach and are for the payment of money in installments not related to one another"). On February 1,

---

breach of the Operating Agreement cannot constitute a "total" breach permitting recovery of one lump sum of monetary benefits.

2024, Respondents failed to pay Petitioner said royalties and, as a result, a breach of contract claim accrued. (ECF No. 1-5 ¶ 145; *but see* ECF No. 1-1 § VIII(1) (requiring profits to be distributed to the members within ten business days of the last day of January).) Pursuant to the installment contract rule, however, only a "partial" breach of contract claim accrued at the time, which merely entitled Petitioner to seek a remedy of specific performance. *See Cipala I*, 806 A.2d at 823; *Cipala II*, 843 A.2d at 1072–73; *see also In re Est. of Balk*, 138 A.3d at 576; *accord Dean*, 2022 WL 2711255, at *6; *R.C. Beeson*, 337 F. App'x at 244. Accordingly, as a "total" breach of contract claim had not accrued under the installment contract rule, the Arbitrator exceeded his powers by awarding damages in conflict with well-established New Jersey law.

Having determined the Arbitrator exceeded his powers by prematurely reviewing a claim for "total" breach of the Operating Agreement, the Court need not review whether the damages awarded were in fact speculative, in conflict with public policy.

For the above stated reasons, the Court **DENIES** Petitioner's Motion to Confirm the Award and **GRANTS** Respondents' Cross-Motion to Vacate the Award. and the matter is **REMANDED** to the AAA for additional arbitration proceedings.

### 2.    New Jersey Revised Uniform Limited Liability Company Act

It is well-established an LLC is a "form of unincorporated business organization that provides corporate-style limited liability to its owners, while affording the owners the partnership-like capacity to structure the entity by agreement rather than as prescribed by statute." *Patel v. New Jersey Dep't of Treasury, Div. of Revenue & Enter. Servs.*, 318 A.3d 685, 688–89 (N.J. Super. Ct. App. Div. 2024) (quoting *Assemb. Regul. Oversight & Gaming Comm. Statement to A. 1543* (Jan. 30, 2012)); *see also Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149 (3d Cir. 1988) ("We begin with the fundamental propositions that a corporation is a separate entity from its

shareholders and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." (internal citation omitted) (quoting *State, Dep't of Environ. Prot. v. Ventron Corp.*, 468 A.3d 150, 164 (N.J. 1983))). "As a result, LLCs have become the business entity form of choice for new businesses, and far more . . . LLCs have been formed in recent years than corporations and limited partnerships combined." N.J. Stat. Ann. § 42:2C-1 Editor's Notes (Jan. 30, 2012).

An LLC organized and governed under the laws of New Jersey is subject to the Revised Uniform Limited Liability Company Act ("NJ RULLCA"), N.J. Stat. Ann. § 42:2C-1, et seq. *See also IE Test, LLC v. Carroll*, 140 A.3d 1268, 1275 n.3 (N.J. 2016) ("All LLCs in New Jersey are now subject to the [NJ] RULLCA"). Pursuant to the NJ RULLCA, a NJ LLC may be operated under the terms of an operating agreement, which governs: (1) the relations among the members; (2) the rights and duties of a manager; (3) the activities of the LLC and the conduct of same; and (4) the means and conditions to amend the agreement. N.J. Stat. Ann. § 42:2C-11(a); *see also* N.J. Stat. Ann. § 42:2C-11(i) (requiring the NJ RULLCA "to be liberally construed to give the maximum effect to the principle of freedom of contract and to the enforceability of operating agreements"); *but see* N.J. Stat. Ann. § 42:2C-11(c) (providing eleven statutory limits to the scope of an operating agreement). The NJ RULLCA defines the term "operating agreement" broadly to include any agreement, "whether or not referred to as an operating agreement and whether oral, in a record, implied, or in any combination thereof, of all the members of a[n] [LLC]." N.J. Stat. Ann. § 42:2C-2; *see also* N.J. Stat. Ann. § 42:2C-2(c) (permitting a preformation operation agreement). In the absence of an operating agreement, or to the extent such an agreement does not otherwise provide for a matter, the default provisions of the NJ RULLCA shall apply. *See* N.J. Stat. Ann. §§

42:2C-11(b), -37; *see also* N.J. Stat. Ann. § 42:2C-18 (requiring merely a certificate of formation to form an LLC).

The Franchise Company is a NJ LLC. (*See* ECF No. 4-2 at 32–41; *accord* ECF No. 1-1 §§ III, XI(1).) Prior to and following the formation of the Franchise Company, all members of the NJ LLC agreed to the terms of the Operating Agreement. (*See generally* ECF Nos. 1-1, 1-2); *see, e.g.*, *Premier Physician Network, LLC v. Maro*, 256 A.3d 1069, 1076 (N.J. Super. Ct. App. Div. 2021) (recognizing an agreement as an operating agreement if all existing members agree to the terms of same); *Garlapathi v. Kamishetty*, No. A-4417-19, 2021 WL 4851294, at *1 (N.J. Super. Ct. App. Div. Oct. 19, 2021) (recognizing a "partnership agreement" as an operating agreement); *Flor v. Greenberg Farrow Architectual Inc.*, No. A-2208-20, 2023 WL 7036278, at *15 (N.J. Super. Ct. App. Div. Oct. 26, 2023) (recognizing an agreement to create an LLC as an operating agreement); *Williamsberg v. Aparri, LLC*, No. A-3996-21, 2023 WL 8889303, at *2 (N.J. Super. Ct. App. Div. Dec. 26, 2023) (recognizing a draft agreement as an operating agreement where members agreed to terms of same orally). Therefore, the Franchise Company is to be operated under the terms of the Operating Agreement and, to the extent the agreement does not provide otherwise, the default provisions of the NJ RULLCA. *See* N.J. Stat. Ann. §§ 42:2C-2, -11; *see also* N.J. Stat. Ann. § 42:2C-1 Editor's Notes (Jan. 30, 2012) (identifying the NJ RULLCA as a "second generation" LLC statute, which provides "a series of 'default rules' that govern the relations among the members in situations they have not addressed in their operating agreement").

In relevant part, the Operating Agreement read in conjunction with the NJ RULLCA provide the following. First, upon formation, both Petitioner and Respondents were members/managers ("members") of the Franchise Company. (ECF No. 1-1 §§ III, VI ¶ 6, XI ¶ 1; *accord* ECF No. 4-2 at 32–41 (identifying Petitioner and Respondents as

"[m]embers/[m]anagers")); *see also* N.J. Stat. Ann. § 42:2C-2 (defining the terms "member" and "manager"). The Operating Agreement provided each member with a transferable interest to receive net profits according to his or her respective ownership interest, which were to be distributed to the members on a yearly basis from a joint distribution account. (ECF No. 1-1 §§ VIII ¶ 1, IX ¶¶ 2–3); *see also* N.J. Stat. Ann. § 42:2C-2 (defining the term "distribution" to mean "a transfer of money or other property from [the] [LLC] to another person on account of a transferable interest"); *id.* (defining the term "transferable interest" to mean "the right, as originally associated with a person's capacity as a member, to receive distributions from a limited liability company in accordance with the operating agreement, whether or not the person remains a member"). Petitioner, however, would be dissociated as a member if twenty franchise stores were not established within fifty-two months of the formation. (ECF No. 1-1 § V ¶ B); *see also* N.J. Stat. Ann. § 42:2C-46(b) (permitting dissociation if "[a]n event stated in the operating agreement as causing the [member]'s dissociation occurs").

Next, upon dissociation, Petitioner ceases to be a member of the Franchise Company. (*See* ECF No. 1-1 § V ¶ B); *accord* N.J. Stat. Ann. § 42:2C-2. However, Petitioner retains a right "to receive 40% of the royalties for any franchise stores established during the fifty four month period." (ECF No. 1-2); *accord* N.J. Stat. Ann. § 42:2C-2. As the Operating Agreement does not define the term royalties or provide when said royalties are to be distributed, the NJ RULLCA governs such matters. *See* N.J. Stat. Ann. §§ 42:2C-11(b). Importantly, Petitioner's right to receive royalties is a "transferable interest," which must be "distributed." *See* N.J. Stat. Ann. § 42:2C-2; (*see also* ECF No. 1-1 § IX ¶ 2 (stating money paid to the parities are to be distributed from the joint distribution account).) Pursuant to N.J. Stat. Ann. § 42:2C-35, in relevant part, a NJ LLC "may not make a distribution if after the distribution" the LLC "would not be able to pay its debts

as they become due in the ordinary course of the [LLC]'s activities."[7] N.J. Stat. Ann. § 42:2C-35(a)(1). Therefore, a plain reading of the Operating Agreement in conjunction with the default provisions of the NJ RULLCA provides Petitioner is entitled to a distribution of his transferable interest—40% of the royalties for the six franchise stores established during the fifty four month period—if, *and only if*, the distribution of same would not render the Franchise Company unable to pay its debts in the ordinary course of its activities, which are to be distributed directly from the Franchise Company's distribution account.[8]

Finally, the Operating Agreement contains no provisions either eliminating or limiting a member's insulation from personal liability and, as such, adopts the NJ RULLCA provisions on this issue. *See* N.J. Stat. Ann. § 42:2C-11(g) (permitting "[t]he operating agreement [to] alter or eliminate the indemnification for a member"). The NJ RULLCA insulates a member from personal liability absent extraordinary circumstances, "such as fraud or injustice, [which] warrant piercing the corporate veil." *AV Design Servs.*, 2021 WL 1186842, at *9 (citing *Torres v. Mbogo*, No. A-4671-18, 2020 WL 6112958, at *4 (N.J. Super. Ct. App. Div. Oct. 16, 2020); *accord* N.J. Stat. Ann. § 42:2C-30(a); *but see* N.J. Stat. Ann. §§ 42:2C-11(c)(4), -38(c) (requiring the limited

---

[7] N.J. Stat. Ann. § 42:2C-35 also provides the term "distribution" "does not include amounts constituting reasonable compensation for present or past services or reasonable payments made in the ordinary course of business under a bona fide retirement plan or other benefits program." N.J. Stat. Ann. § 42:2C-35(g). Here, Petitioner's 40% interest in royalties does not constitute as either reasonable compensation or payment under a benefits program.

[8] The Arbitrator determined Petitioner is entitled to gross royalties rather than net royalties. (ECF No. 1-5 ¶ 166.) Pursuant to the broad deference allocated to an arbitrator in the interpretation of an agreement, the Court accepts the Arbitrator's determination that the term royalties refers to gross royalties and not net royalties. However, pursuant to N.J. Stat. Ann. § 42:2C-35, the royalties may only be distributed if the distribution of same would not interfere with the Franchise Company's ability to pay its debts in the ordinary course of its activities.

liability company to indemnify a representative unless the representative breached the duties of loyalty or care). Specifically, N.J. Stat. Ann. § 42:2C-30(a) provides:

> The debts, obligations, or other liabilities of a limited liability company, whether arising in contract, tort, or otherwise:
>
>> (1) are solely the debts, obligations, or other liabilities of the company; and
>>
>> (2) do not become the debts, obligations, or other liabilities of a member or manager solely by reason of the member acting as a member or manager acting as a manager.

However, a member may waive his or her insulation from personal liability under the NJ RULLCA if done so voluntarily and intentionally. *See Knorr v. Smeal*, 836 A.2d 794, 798 (N.J. 2003) (arguing waiver of the Affidavit of Merit statute, N.J. Stat. Ann. § 2A:53A-1, et seq.). "An effective waiver requires a [member] to have full knowledge of his [or her] legal rights and intent to surrender those rights." *Id.* Although intent need not be stated expressly, the circumstances must objectively demonstrate the member knew of his or her right and then abandoned it "clearly, unequivocally, and decisively." *Id.*; *Sroczynski v. Milek*, 961 A.2d 704, 721 (N.J. 2008) (Rivera-Soto, J., concurring in part and dissenting in part) ("A waiver cannot be divined but, instead, must be the product of objective proofs . . . ."); *Fauver*, 707 A.2d at 970 ("[W]aiver cannot be predicated on consent given under a mistake of fact." (internal quotation marks omitted)). The party asserting the doctrines of either waiver or corporate veil piercing bears the burden of establishing same. *See Richard A. Pulaski Const. Co. v. Air Frame Hangars, Inc.*, 950 A.2d 868, 878 (N.J. 2008); *Baldinger v. Baldinger*, No. A-1733-09, 2011 WL 2637005, at *3 (N.J. Super. Ct. App. Div. July 7, 2011).

Here, the breach of contract claim could not be maintained against Respondents as a matter of law absent either waiver or extraordinary circumstances warranting the piercing of the corporate

veil.[9] In response, the Arbitrator argues Respondents waived their right to insulation from personal liability under the NJ RULLCA by failing to assert either: (a) "[the Franchise Company] was a necessary party [to the arbitration]" (*see* ECF No. 1-6 ¶¶ 6–7); or (b) "there [wa]s no basis to pierce the corporate veil" (*id.* ¶ 7).[10] However, Petitioner—not Respondents—had the obligation to assert the doctrines of waiver and corporate veil piercing. (*See generally* ECF No. 1-3.) Furthermore, the Arbitrator was required to conduct a preliminary hearing, Am. Arb. Ass'n, *Commercial Arbitration Rules & Mediation Procedures ("CAR")*, R-22 (Sept. 1, 2022), available at https://perma.cc/J5QK-6NJM, during which the Arbitrator was to address "whether all necessary or appropriate parties [we]re included in the arbitration." *Id.* at 36 ¶ P-2(a)(ii). Accordingly, as neither Petitioner nor the Arbitrator addressed the issue of personal liability prior to the Award, the Arbitrator exceeded his powers by awarding damages against Respondents personally in conflict with the NJ RULLCA and the well-established fundamental purpose for incorporation, *i.e.*, insulation from personal liability.

For the above stated reasons, Petitioner's Motion to Confirm the Award is **DENIED**, Respondents' Cross-Motion to Vacate the Award is **GRANTED**, and the matter is **REMANDED** to the AAA for additional arbitration proceedings.

---

[9] The Arbitrator claims Respondents did not argue prior to the issuance of the Award "there is no basis to pierce the corporate veil." (ECF No. 1-6 ¶ 7.) It is well-established under New Jersey law, however, the doctrine of piercing the corporate veil is an equitable remedy, not an affirmative defense. *Richard A. Pulaski Const. Co.*, 950 A.2d at 877-78. Furthermore, "[t]he party seeking to pierce the corporate veil bears the burden of proof." *Id.* (quoting *Tung v. Briant Park Homes, Inc.*, 670 A.2d 1092, 1096 (N.J. Super. Ct. App. Div. 1996). Therefore, Petitioner and not Respondents was required to assert the doctrine of piercing the corporate veil and to establish a basis for same.

[10] The Arbitrator also argues although the Operation Agreement provides for distribution of the interest in royalties, it does not state the Franchise Company "is the obligor for those payments." (ECF No. 1-6 ¶ 7; *but see* ECF No. 1-1 § IX ¶¶ 2–3 (providing the royalties were to be deposited into the Franchise Company's joint distribution accounts and all distributions were to be distributed from same).)

C.        **Attorneys' Fees & Arbitration Costs**

Any award of attorneys' fees and costs "must start from the proposition that New Jersey has a strong public policy against the shifting of costs and that th[e] [New Jersey Supreme] Court has embraced that policy by adopting the 'American Rule,' which prohibits recovery of counsel fees by the prevailing party against the losing party." *Litton Indus., Inc. v. IMO Indus., Inc.*, 982 A.2d 420, 439–40 (N.J. 2009) (quoting *In re Est. of Vayda*, 875 A.2d 925, 928 (N.J. 2005)). "Under the American Rule, which is the law of [New Jersey], a prevailing party may not be granted attorney's fees unless authorized by the parties' contract, court rule, or statute." *Id.* (internal quotation marks omitted) (quoting *Rock Work, Inc. v. Pulaski Const. Co., Inc.*, 933 A.2d 988, 991 (App. Div. 2007)). "The [American] [R]ule promotes three goals: (1) unrestricted access to the courts for all persons; (2) ensuring equity by not penalizing persons for exercising their right to litigate a dispute, even if they should lose; and (3) administrative convenience." *Boyle v. Huff*, 314 A.3d 793, 799 n.5 (N.J. 2024) (quoting *In re Niles Tr.*, 823 A.2d 1, 8 (N.J. 2003)). The New Jersey Supreme Court has only recognized four exceptions to this rule permitting fee-shifting pursuant to: (1) statutes; (2) court rules; (3) principals of fiduciary malfeasance; and (4) the parties' contract. *Litton Indus.*, 982 A.2d at 439–40.

Relevant to this matter, New Jersey recognizes "a party may agree by contract to pay attorneys' fees." *Id.* (quoting *N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.*, 730 A.2d 843, 848 (N.J. 1999)). However, "even where attorney-fee shifting is controlled by contractual provisions, courts will strictly construe that provision in light of the general policy disfavoring the award of attorneys' fees." *Id.* (internal quotation marks omitted). Therefore, the courts have upheld fee-shifting only if expressly provided for within the parties' contract—*i.e.*, "the American Rule will prevail in arbitration unless the parties otherwise agree." *Rock Work*, 933 A.2d at 996; *accord*

*Mitschele v. Wilf/Mitschele Joint Venture*, No. A-777-18, 2020 WL 2121574, at *10–11 (N.J. Super. Ct. App. Div. May 5, 2020) (holding the arbitrator did not have the authority to award attorneys' fees solely pursuant to the AAA Rules); *but see Zecca v. Monterey Condo. Ass'n, Inc.*, No. A-4531-18, 2020 WL 2177053, at *1–2 (N.J. Super. Ct. App. Div. May 6, 2020) (holding the arbitrator had the authority to award attorneys' fees pursuant to the AAA Rules pursuant to the terms of Court order).

Here, fee-shifting is not expressly provided for within the General Partnership Agreement. (*See generally* ECF No. 1-1.) Rather, the Arbitrator awarded attorneys' fees and costs as the parties agreed to arbitrate in accordance with the rules of the AAA (*id.* § XI ¶ 2); and AAA Rule 49(d)(2) states attorneys' fees and costs may be awarded "if all parties have requested such an award" (ECF No. 1-5 ¶ 138). New Jersey courts, however, have specifically held an agreement to arbitrate in accordance with the rules of an arbitrator to be insufficient to provide an arbitrator with the authority to award attorneys' fees and costs. *Rock Work*, 933 A.2d at 995–96. Rather, an arbitrator may only fee-shift if the parties' *contract* expressly authorizes same. *Id.* at 996. Accordingly, as the Arbitrator awarded attorneys' fees and costs absent an express provision in the Operating Agreement authorizing same, the Arbitrator exceeded his powers in conflict with well-established New Jersey law. *See, e.g.*, *see, e.g.*, *Regan v. Conway*, No. A-1962-22, 2025 WL 1021308, at *1, 14 (N.J. Super. Ct. App. Div. Apr. 7, 2025); *Delaware River Port Auth. v. Fraternal Ord. of Police Penn-Jersey Lodge No. 30*, No. A-4473-16, 2018 WL 4761907, at *5–6 (N.J. Super. Ct. App. Div. Oct. 3, 2018).

For the above stated reasons, Petitioner's Motion to Confirm the Award is **DENIED** and Respondents' Cross-Motion to Vacate the Award is **GRANTED**. and the matter is **REMANDED** to the AAA for additional arbitration proceedings.

**IV.     CONCLUSION**

For the reasons set forth above, Petitioner's Motion to Confirm is **DENIED**, Respondents' Motion to Vacate is **GRANTED**, and the matter is **REMANDED** to the AAA for additional arbitration proceedings and further evaluation consistent with this Opinion. An appropriate order follows.


**Date: January 13, 2026**                              */s/ Brian R. Martinotti*
                                                        **HON. BRIAN R. MARTINOTTI**
                                                        **UNITED STATES DISTRICT JUDGE**